*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0446P (6th Cir.)
File Name: 03a0446p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WOMEN'S MEDICAL
PROFESSIONAL
CORPORATION; MARTIN
HASKELL, MD,
    *Plaintiffs-Appellees,*

    *v.*

BOB TAFT, Governor; BETTY
D. MONTGOMERY, Attorney
General; MATHIAS H. HECK,
JR.,
    *Defendants-Appellants.*

No. 01-4124

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 00-00368—Walter H. Rice, District Judge.

Argued: April 29, 2003

Decided and Filed: December 17, 2003

Before: RYAN and BATCHELDER, Circuit Judges;
TARNOW, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Stephen P. Carney, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellants. Alphonse A. Gerhardstein, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Stephen P. Carney, Anne Berry Strait, Karl William Schedler, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellants. Alphonse A. Gerhardstein, Jennifer L. Branch, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, David C. Greer, BIESER, GREER & LANDIS, Dayton, Ohio, for Appellees. Eric D. Miller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., A. Stephen Hut, Jr., Kimberly A. Parker, WILMER, CUTLER & PICKERING, Washington, D.C., Jennifer Dalven, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici Curiae.

RYAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. TARNOW, D. J. (pp. 30-54), delivered a separate dissenting opinion.

_____

**OPINION**

_____

RYAN, Circuit Judge. For the second time in six years, we must decide whether an Ohio statute that restricts partial birth abortions violates the Fourteenth Amendment of the United

_____

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

States Constitution. In *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997), we held, *inter alia*, that Ohio's first attempt to restrict partial birth abortions violated the Fourteenth Amendment because it imposed an "undue burden" on "a woman's right to choose to have an abortion." *Id.* at 200-03.

The plaintiffs claim that Ohio's new partial birth abortion statute, Ohio Rev. Code Ann. § 2919.15.1 (Anderson 2002) (the Act), is likewise unconstitutional, because: (1) it does not contain an adequate health exception; and (2) it imposes an "undue burden" upon a woman seeking to abort a non-viable fetus, in that the description of the banned abortion method encompasses the concededly lawful dilation and evacuation (D & E) abortion procedure.

As set forth in detail below, we reject both claims, and hold that Ohio's new statute does not violate the Constitution in any respect. We shall therefore reverse the district court's judgment.

## I.

### INTRODUCTION

After our decision in *Voinovich*, Ohio's General Assembly enacted the present statute, Ohio Rev. Code Ann. § 2919.15.1 (the Act). The Act restricts partial birth abortions, but it differs significantly from the law struck down in *Voinovich* in that the Act specifically excludes the "dilation and evacuation" (D & E) method from its reach. Ohio Rev. Code Ann. § 2919.15.1(F). The Act also contains a "health exception" which permits the partial birth abortion method before and after viability, when necessary to protect the mother's health. Ohio Rev. Code Ann. § 2919.15.1(B), (C).

Shortly before the Act's effective date, the United States Supreme Court decided *Stenberg v. Carhart*, 530 U.S. 914 (2000), a case concerning the constitutionality of a Nebraska

law that banned all partial birth abortions before and after viability. The Court held the law unconstitutional on two grounds. First, Nebraska's ban lacked a "health exception" that would permit doctors to perform the banned abortion method when necessary to protect the mother's health. *Id.* at 937-38. Second, Nebraska's ban imposed an "undue burden" on the abortion right by restricting the commonly performed dilation and evacuation (D & E) method of abortion. *Id.* at 938-40.

Almost immediately after *Carhart* was decided, the plaintiffs who prevailed in *Voinovich* brought a facial challenge to the constitutionality of the present statute. They challenged the Act on several grounds, the principal claims being: (1) the Act's health exception is constitutionally inadequate, and (2) the Act imposes an "undue burden" on the abortion right by restricting the commonly performed dilation and evacuation (D & E) abortion method. The district court agreed with the plaintiffs' first claim and held that the Act's health exception was constitutionally inadequate. In the district court's view, *Carhart* requires states to permit a partial birth abortion whenever a physician believes it to be "simply the safest" available procedure. On the basis of this reading of *Carhart*, the district court invalidated the Act and entered a permanent injunction against its enforcement. The district court declined to address the plaintiffs' undue burden claim at the permanent injunction stage, but both parties urge us to reach that issue on appeal.

For the reasons set forth below, we hold that the Act conforms in all respects to the requirements of the Fourteenth Amendment in the abortion legislation context, as those requirements were announced in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), and subsequently applied in *Stenberg v. Carhart*, 530 U.S. 914 (2000). We therefore **REVERSE** the district court's judgment and **VACATE** the injunction preventing enforcement of the Act.

## II.  FACTUAL BACKGROUND

### A.  Parties

The plaintiffs are the Women's Medical Professional Corporation (WMPC), an Ohio corporation providing abortion services in Ohio, and Dr. Martin Haskell, the physician who owns and operates WMPC. They perform procedures prohibited by the Act and fear civil and criminal liability as a result. The defendants are various officers of the State of Ohio sued in their official capacities.

### B.  Late Term Abortion Procedures

A clear understanding of our resolution of the issues presented requires an equally clear understanding of two procedures used to put to death fetuses that have advanced to the later stages of the second trimester of the mother's pregnancy. The labels we use to describe each of these procedures, while not perfectly precise, have a generally understood meaning, regularly relied upon by courts, litigants, medical experts, and legislatures operating in this field of law. And we reject the efforts by the parties and *amici* to fortify their arguments by the use of labels and descriptive language obviously employed for revulsive or obfuscating effect.

### 1.  Dilation and evacuation – D & E

As performed late in the second trimester, the abortion procedure commonly referred to as dilation and evacuation, or "D & E," begins with dilation of a woman's cervix. *Carhart*, 530 U.S. at 925; *Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d 929, 946 (S.D. Oh. 2001). Once sufficient dilation is achieved, the physician reaches into the woman's uterus with an instrument, grasps an extremity of the fetus, and pulls. *Carhart*, 530 U.S. at 925-26; *Women's Med.*, 162 F. Supp. 2d at 946. When the fetus lodges in the cervix, the traction between the grasping instrument and the cervix causes dismemberment and eventual death, although death

may occur prior to dismemberment. *See Carhart*, 530 U.S. at 925-26; *Women's Med.*, 162 F. Supp. 2d at 946. The process continues until the entire dead fetus has been removed, piece-by-piece, from the woman's uterus.

### 2.  Dilation and extraction – D & X

In the abortion procedure now widely known as partial birth abortion and also commonly referred to as dilation and extraction, or "D & X," and sometimes called "intact D & E" or "intact D & X," *see Carhart*, 530 U.S. at 927-28; ACOG *Statement of Policy* (1997), the physician removes the dead fetus whole and "'intact,' *i.e.*, in one pass, rather than in several passes." *Carhart*, 530 U.S. at 927. Dr. Haskell claims to have coined the clinical term "dilation and extraction" in 1992 in order to distinguish the intact abortion procedure from the more common "dismemberment-type D & E" abortion method.

The physician initiates the D & X or partial birth abortion procedure by dilating a woman's cervix, but to a greater degree than in the traditional D & E procedure. *Women's Med.*, 162 F. Supp. 2d at 946. Once the physician achieves sufficient dilation, the manner in which the abortion proceeds depends upon the presentation of the fetus. Although some doctors take the fetus as it presents, Dr. Haskell maneuvers the fetus to a feet-first position (breech presentation) before proceeding. *Carhart*, at 927-28; *Women's Med.*, 162 F. Supp. 2d at 946. In a breech extraction, the physician partially delivers the fetus through the mother's cervix up to a point that allows the physician to access the fetus's head, which is inside the mother, while stabilizing the fetus's body, which is outside the mother. Then, in order to collapse the fetus's skull (so that it will pass easily through the cervix), the physician "forces a pair of scissors into the base of the skull, enlarges the opening and evacuates the contents with a suction catheter." *Women's Med.*, 162 F. Supp. 2d at 946. The abortion concludes with the removal, in a single pass, of the fetus's intact, dead body. *Carhart*, 530 U.S. at 927. If the

fetus presents head first (a cephalic presentation), the doctor first collapses the fetus's exposed skull by "breaching and compressing the [head] with the forceps' jaws, inserting a finger . . . , or piercing the [head] with a sharp instrument, such as a tenaculum or a large-bore needle." W. Martin Haskell, MD, *et al.*, *Surgical Abortion After the First Trimester*, in *A Clinician's Guide to Medical and Surgical Abortion*, 135 (Maureen Paul, MD, *et al.*, eds. 1999). The doctor then suctions out the fetus's skull contents, if necessary, *id.*, and completes the delivery of the fetus from the mother's body, whole and intact, in a single pass. *Carhart*, 530 U.S. at 927.

We now turn to an examination of the Ohio statute.

### C. Statutory Provisions – Ohio Rev. Code Ann. § 2919.15.1

The Act makes it a second-degree felony to commit the crime of "partial birth feticide." Ohio Rev. Code Ann. § 2919.15.1(D). A person commits partial birth feticide by violating either Ohio Rev. Code Ann. § 2919.15.1(B), which applies after viability, or Ohio Rev. Code Ann. § 2919.15.1(C), which applies before viability. Both provisions use identical language to identify the crime:

> When the fetus that is the subject of the procedure is [or "is not"] viable, no person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is not necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

Ohio Rev. Code Ann. § 2919.15.1(B), (C).

The Act defines "partial birth procedure" as "the medical procedure that includes all of the following elements in sequence":

> (a)  Intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

> (b)  In a breech presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;

> (c)  Intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

> (d)  Completion of the vaginal delivery of the fetus.

Ohio Rev. Code Ann. § 2919.15.1(A)(3).

In *Carhart*, 530 U.S. at 937-38, the Court held the Nebraska statute unconstitutional, in part, because it contained no exception at all to protect the mother's health. In contrast, Ohio's statute contains a detailed health exception that permits the partial birth procedure, both before and after viability, when "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(B), (C). The Act defines "serious risk of the substantial and irreversible

impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(A)(5).

The Act also identifies three specific abortion procedures that remain legal: "the suction curettage procedure of abortion, the suction aspiration procedure of abortion, [and] the dilation and evacuation procedure of abortion." Ohio Rev. Code Ann. § 2919.15.1(F). According to Ohio Rev. Code Ann. § 2919.15.1(A)(1), the "'[d]ilation and evacuation procedure of abortion' does not include the dilation and extraction procedure of abortion." Thus, the Act, using the clinical term coined by Dr. Haskell, gives clear guidance about which abortion procedures may be performed without restriction. The Act also declares that its prohibition "does not apply to any person who performs or attempts to perform a legal abortion if the act that causes the death of the fetus is performed prior to the fetus being partially born even though the death of the fetus occurs after it is partially born." Ohio Rev. Code Ann. § 2919.15.1(G). "Partially born" is defined to mean "that the portion of the body of an intact fetus described in division (A)(3)(b) of this section has been intentionally extracted from the body of the mother." Ohio Rev. Code Ann. § 2919.15.1(A)(4). And, as the Act explains, "'[f]rom the body of the mother' means that the portion of the fetus' body in question is beyond the mother's vaginal introitus in a vaginal delivery." Ohio Rev. Code Ann. § 2919.15.1(A)(2).

Finally, the Act expresses the legislature's purpose. In summary, the Ohio General Assembly intended "to prevent the unnecessary death of fetuses when they are substantially outside the body of the mother," in pursuit of Ohio's "interest in maintaining a strong public policy against infanticide, regardless of the life expectancy or state of development of the child." H.B. 351, § 3(A), (B), 123rd Gen. Assem., Reg.

Sess. (Ohio 2000). The Act also attempts to "further[] the state interest in preventing unnecessary cruelty." *Id.* at § 3(D).

### D.  District Court Proceedings

On July 27, 2000, soon after the Supreme Court's decision in *Carhart*, the plaintiffs filed a complaint seeking a temporary restraining order and preliminary injunction to prevent the defendants from enforcing the Act. The plaintiffs challenged the Act on four grounds: (1) the Act imposes an undue burden by sweeping in D & E abortions performed during the second trimester; (2) the Act's "health exception" is inadequate; (3) the Act lacks adequate scienter standards; and (4) the Act unconstitutionally permits third-party civil suits against physicians who violate its terms. The district court issued two lengthy rulings, one at the preliminary injunction stage, *Women's Med. Prof'l Corp. v. Taft*, 114 F. Supp. 2d 664 (S.D. Oh. 2000), and another at the permanent injunction stage. *Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d 929 (S.D. Oh. 2001).

In its preliminary injunction ruling, the court rejected the plaintiffs' undue burden claim. *Women's Med.*, 114 F. Supp. 2d at 683. Although the court declined to rule on the issue at the permanent injunction stage, *Women's Med.*, 162 F. Supp. 2d at 937, both parties urge us to reach this issue on appeal. Also, in both rulings, the district court held that the Act's pre-viability health exception was too narrow because it did not permit the partial birth procedure "'to be performed in cases where the medical evidence shows that it is *simply the safest* method of abortion.'" *Women's Med.*, 162 F. Supp. 2d at 940 (emphasis added) (quoting *Women's Med.*, 114 F. Supp. 2d at 688). For the same reason, the court struck down the Act's post-viability health exception as applied to women in medical need of a post-viability abortion. *Women's Med.*, 162 F. Supp. 2d at 961-62. Ohio appeals these components of the district court's judgment.

With respect to the plaintiffs' "scienter" claim, the district court concluded that it would be unconstitutional for an abortion law to impose strict liability regarding a determination of viability or the applicability of the health exception. *Women's Med.*, 114 F. Supp. 2d at 699; *Women's Med.*, 162 F. Supp. 2d at 936. Nevertheless, the court preserved the Act's constitutionality by importing a "recklessness" scienter requirement pursuant to Ohio law. *Women's Med.*, 114 F. Supp. 2d at 700, 703-04; *Women's Med.*, 162 F. Supp. 2d at 936. Neither party appeals this aspect of the judgment.

Finally, at the permanent injunction stage, the district court held that the plaintiffs lacked standing to challenge the constitutionality of the Act's third-party civil suit provision. *Women's Med.*, 162 F. Supp. 2d at 967. The plaintiffs do not appeal this part of the decision.

### III. ANALYSIS

Our standard of review is that stated in our earlier decision in *Voinovich*, 130 F.3d 187:

This court reviews questions of law *de novo*. . . . While we normally review questions of fact for clear error, *see* Fed. R. Civ. P. 52, an appellate court is to conduct an independent review of the record when constitutional facts are at issue.

*Id.* at 192 (citing *Jacobellis v. Ohio*, 378 U.S. 184, 190 & n.6 (1964)).

Our analysis begins, as it must, with the Supreme Court's decisions in *Casey*, 505 U.S. 833, and *Carhart*, 530 U.S. 914. These two cases establish the governing standards for the "undue burden" and "health exception" issues we must decide today. In *Casey*, 505 U.S. 833, the Supreme Court evaluated the constitutionality of a Pennsylvania statute that imposed a variety of restrictions on abortion. In an opinion authored

jointly by Justices O'Connor, Kennedy, and Souter, the Court reaffirmed what it called the "essential holding" of *Roe v. Wade*, 410 U.S. 113 (1973). *Casey*, 505 U.S. at 845-46. While preserving for women the right to choose an abortion, the Court rejected the "rigid trimester" approach from *Roe* and replaced it with a constitutional line drawn at viability. *Id.* at 870-74. The Court held that a state may regulate abortion before viability as long as it does not impose an "undue burden" on a woman's right to terminate her pregnancy. *Id.* at 876. A state may regulate and even prohibit abortion after viability "'except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Id.* at 879 (quoting *Roe*, 410 U.S. at 164-65).

In *Carhart*, 530 U.S. 914, a majority of the Supreme Court applied *Casey*'s requirements to a Nebraska statute that attempted to ban partial birth abortions. The Court struck down Nebraska's ban for two reasons: (1) it lacked a maternal health exception, *id.* at 937-38; and (2) it defined the banned procedure so broadly and vaguely that it swept in the most common method for performing late term abortions, the dilation and evacuation (D & E) procedure, *id.* at 939-40. In contrast, the statute before us contains a maternal health exception, defines the banned procedure narrowly, and explicitly excludes from its ban the dilation and evacuation (D & E) procedure. We must decide whether the Act is sufficiently protective and specific to satisfy constitutional requirements.

It bears emphasis, as an initial matter, that while we must protect the abortion right against unwarranted state intrusion, we are not empowered to ignore or undervalue the governmental interests this statute embodies. An essential feature of the jointly authored opinion in *Casey* is the reaffirmation of the "substantial state interest in potential life throughout pregnancy." 505 U.S. at 876. As *Casey* recognizes, the Court's prior decisions, beginning with *Roe*, 410 U.S. 113, had enforced a rigid framework that

"sometimes contradicted the State's permissible exercise of its powers." 505 U.S. at 872. *Casey* thus attempts to restore a balance of interests between women seeking abortions and states seeking to regulate abortions by reasserting the importance of the states' interests and emphasizing that the abortion right is not infringed merely because a law makes it "more difficult or more expensive" to exercise. *Id.* at 873-74.

Along similar lines, although *Carhart* invalidates Nebraska's partial birth abortion ban, it does so only after acknowledging the legitimate relationship between the interest in protecting fetal life and the more subtle interests motivating the Nebraska legislature's decision to ban partial birth abortions: that is, showing concern for fetal life; preventing cruelty to partially born infants; and preserving the integrity of the medical profession. 530 U.S. at 930-31. Likewise, in this case, Ohio grounds its ban on three interests: preventing the unnecessary death of fetuses when they are substantially outside the mother's body; maintaining a strong public policy against infanticide; and preventing unnecessary cruelty. H.B. 351, § 3, 123rd Gen. Assem., Reg. Sess. (Ohio 2000). These interests bear a striking resemblance to those implicitly accepted in *Carhart*, 530 U.S. at 930-31, and also reflect the long-recognized interests in protecting what *Roe* called "potential life," *Roe*, 410 U.S. at 154, and showing "concern for the life of the unborn," *Casey*, 505 U.S. at 869.

Ohio's expression of these important and legitimate interests warrants a measure of deference, rather than the virtual assumption of unconstitutionality that has led federal courts, thus far, to invalidate the efforts of at least 20 states to exercise the limited sovereign authority to regulate abortions and abortion methods. Ordinarily, it is only in legislation properly subject to strict scrutiny that a presumption of unconstitutionality applies. *Cf. Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 276 F.3d 876, 879 (6th Cir.), *cert. denied*, 536 U.S. 923 (2002); *Richland Bookmark, Inc. v. Nichols*, 137 F.3d 435, 439 (6th Cir. 1998). Strict scrutiny, of course, no

longer applies to abortion legislation. *Casey*, 505 U.S. at 871-77. Indeed, even in the less deferential realm of strict scrutiny, the Supreme Court recently has shown, in an altogether different context to be sure, considerable deference to states attempting to balance competing, high-order interests. *Cf. Grutter v. Bollinger*, 123 S. Ct. 2325, 2339, 2346 (2003). Therefore, while the Act cannot stand if it impermissibly infringes on the abortion right, we will not assume that it violates the Fourteenth Amendment merely because it reflects interests in preventing unnecessary death and cruelty to partially born children, maintaining a strong public policy against infanticide, and preserving the integrity of the medical profession. We turn now to the specific challenges raised by the plaintiffs.

### A. Adequacy of Health Exception

Unlike the Nebraska statute invalidated in *Carhart*, partly because it did not have a health exception, the Ohio Act contains a detailed health exception that applies both before and after viability. Sections 2919.15.1(B) and (C) permit the partial birth procedure when it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(B), (C). The Act defines "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(A)(5).

The plaintiffs contend that this exception is constitutionally inadequate because, they argue, a valid health exception must give physicians the discretion to use the partial birth procedure in any and every circumstance in which a particular physician deems the procedure preferable to other readily

available and more widely used procedures, such as the dilation and evacuation (D & E) procedure. The plaintiffs insist that the Constitution bars Ohio from enacting a health exception that permits the partial birth procedure only when necessary to prevent "serious risk[s]" involving "medically diagnosed condition[s]" that complicate a woman's pregnancy. Ohio Rev. Code Ann. § 2919.15.1(A)(5). In the plaintiffs' view, to satisfy the Fourteenth Amendment, a health exception must make the partial birth abortion method available whenever any physician deems it "simply safer" than using alternative methods. Ohio responds that a valid health exception need only permit the partial birth procedure when necessary to prevent significant, as opposed to negligible, health risks, and that its maternal health exception meets and exceeds this standard. We agree, and therefore hold that Ohio's maternal health exception is valid because it permits the partial birth procedure when necessary to prevent significant health risks. The Fourteenth Amendment, as applied in *Casey* and *Carhart*, requires nothing more.

As we have said, in *Casey*, 505 U.S. 833, the Supreme Court evaluated the constitutionality of a Pennsylvania statute that imposed a variety of restrictions on abortion. The Court preserved the right to choose an abortion but rejected the "rigid trimester" approach from *Roe* and replaced it with a constitutional line drawn at viability. *Id.* at 870-74. Before viability, the Court held, a state may regulate abortion as long as it does not impose an "undue burden" on a woman's right to terminate her pregnancy. *Id.* at 876. After viability, a state may regulate and even prohibit abortion "'except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Id.* at 879 (quoting *Roe*, 410 U.S. at 164-65).

According to *Casey*, an "undue burden" exists when "a state regulation has the purpose or effect of placing a *substantial* obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877 (emphasis added). The Court applied its "undue burden" standard to the

Pennsylvania statute, beginning with the provision that exempted women from compliance with the various regulations in the event of a "medical emergency." *Id.* at 879-80. Pennsylvania defined a "medical emergency" as:

> that condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Id.* at 879 (internal quotation marks and citation omitted).

The plaintiffs in *Casey* challenged this definition as being too narrow, because "it forecloses the possibility of an immediate abortion despite some significant health risks." *Id.* at 880. Thus, the pertinent interpretive question in *Casey* was whether the definition of "medical emergency" encompassed certain specified "conditions [that] could lead to an illness with substantial and irreversible consequences." *Id.* These "conditions" included physical, pregnancy-related conditions such as preeclampsia, inevitable abortion, and premature ruptured membrane. *Id.* The Court focused on the fact that, at the appellate level, the Third Circuit had construed the term "serious risk" to mean "'that compliance with [Pennsylvania's] abortion regulations would not in any way pose a significant threat to the life or health of a woman.'" *Id.* (quoting *Planned Parenthood v. Casey*, 947 F.2d 682, 701 (3d Cir. 1991)). Based on this narrowing construction, the Court held that "the medical emergency definition imposes no undue burden on a woman's abortion right." *Casey*, 505 U.S. at 880. The Third Circuit also had expressed its view that the wording of Pennsylvania's medical emergency exception was "carefully chosen to prevent negligible risks to life or health or significant risks of only transient health problems from serving as an excuse for noncompliance." *Planned Parenthood v. Casey*, 947 F.2d at 701 (3d Cir. 1991).

In *Carhart*, 530 U.S. 914, the Court applied *Casey* to Nebraska's attempted ban of the partial birth abortion method. The majority opinion, by Justice Breyer, held the law unconstitutional for two reasons. First, the law contained no maternal health exception at all. *Id.* at 930-38. Second, the law's definition of "partial birth abortion" encompassed the widely used D & E method as well as D & X, thereby imposing an undue burden on a woman's pre-viability right to choose an abortion. *Id.* at 938-46.

*Carhart*'s first holding, of primary significance here, is that a statute banning D & X "must contain a health exception" because "a statute that altogether forbids D & X creates a significant health risk." *Id.* at 938. Nebraska sought to persuade the Court that its omission of a maternal health exception did not render the ban unconstitutional because a partial birth abortion is never necessary to protect a woman's health. *Id.* at 931-32. Nebraska faced a difficult task on this point, as its burden was "to demonstrate that banning D & X without a health exception may not create significant heath risks for women." *Id.* at 932. The Court concluded that Nebraska failed to carry that burden. *Id.* at 937-38. Thus, based on the "medically related evidentiary circumstances" in the case, *id.* at 937, the Court rejected Nebraska's absolute claim that D & X is *never safer* than other abortion procedures.

The case before us involves a different type of absolute position, taken not by the state but by physicians who routinely perform the restricted procedure. They urge us to endorse their view that D & X is *always safer* than other methods used during the late second trimester. Stated differently, the plaintiffs believe that a health exception, to be constitutional, must give physicians complete freedom to perform abortions using the D & X procedure whenever they wish to do so. We disagree.

Taken together, *Casey* and *Carhart* stand for the proposition that states may restrict an abortion procedure

except when the procedure is necessary to prevent a significant health risk. *Casey* specifically endorses a "medical emergency" exception that, based on the Third Circuit's narrowing construction, excused compliance with the various regulations in any situation involving a "'significant threat to the life or health of a woman.'" 505 U.S. at 880 (citation omitted). *Carhart*, in requiring a health exception without identifying its specific content, relies heavily on medical evidence and lower court findings indicating that D & X might be "significantly safer in certain circumstances," 530 U.S. at 934 (emphasis omitted), that D & X "significantly obviates health risks in certain circumstances," *id.* at 936, that a complete D & X ban would "create significant health risks," *id.* at 932, and that "a statute that altogether forbids D & X creates a significant health risk," *id.* at 938. In our view, the Court does not use this terminology loosely; rather, this language demonstrates the Court's attentiveness to the limited number of situations involving a real medical need for D & X. We cannot conclude that the Court meant by this to require that a state's health exception recognize marginal or insignificant risks generalized to the entire population of women seeking late second-trimester abortions.

Our holding finds further support in the familiar phrase, "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother," recited first in *Roe*, 410 U.S. at 164-65, retained in *Casey*, 505 U.S. at 879, and relied on in *Carhart*, 530 U.S. at 931. Although *Carhart* cautions that the term "necessary" does not "refer to an absolute necessity or to absolute proof," 530 U.S. at 937, the word cannot be emptied entirely of its distinctive meaning by being equated with "desirable." As used in *Roe*, 410 U.S. at 164-65, and developed in *Carhart*, 530 U.S. at 937, it at least denotes some measure of compulsion; a "necessary" medical procedure surely is not the same thing as an "optional" or "preferable" one. In our view, the "significant risk" threshold captures this distinction without violating *Carhart*'s admonition against unrealistic standards of proof.

Additionally, merely as a "straightforward application" of *Casey*, *id.* at 938, *Carhart* must be understood in light of the doctrinal shift wrought by *Casey*.  In adopting the "undue burden" standard in *Casey*, the Court believed it had found "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Casey*, 505 U.S. at 876.  Before *Casey*, the Court admitted, its decisions had "undervalue[d] the State's interest in the potential life within the woman." *Id.* at 875.  By rejecting *Roe*'s rigid trimester framework in favor of the undue burden standard, the Court endeavored to protect women from unwarranted interference with the abortion right while allowing states to express, meaningfully, their "concern for the life of the unborn," *id.* at 869, and even their "preference for normal childbirth," *id.* at 872 (internal quotation marks and citations omitted).  Accordingly, a state's regulation of abortion before viability may not have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Id.* at 877.

While the majority opinion in *Carhart* does not employ the undue burden standard explicitly in connection with the health exception issue, its analysis reflects *Casey*'s acknowledgment of the importance of reconciling profound state interests and personal rights.  For example, in *Carhart*, the Court explains that, "[b]y no means must a State grant physicians 'unfettered discretion' in their selection of abortion methods."  530 U.S. at 938 (citation omitted).  The Court assures its dissenting members that it would *not* prohibit a state "from proscribing an abortion procedure whenever a particular physician deems the procedure preferable." *Id.*  In a broader sense, even by focusing on the need for a health *exception*, the Court *invites* state regulation of abortion methods.  If it were otherwise, the Court would have held, in a straightforward fashion, that states may not interfere at all with medical discretion when abortions are involved.

The plaintiffs mistakenly believe that *Carhart* requires that states give physicians unfettered discretion in the choice of

abortion methods.  For support, they rely heavily on a single dictum from *Carhart*: "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Id.* at 931 (citing *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 768-69 (1986); *Colautti v. Franklin*, 439 U.S. 379, 400 (1979); *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 76-79 (1976); *Doe v. Bolton*, 410 U.S. 179, 197 (1973)).  To the extent one might read this phrase as authority for the plaintiffs' absolute view, *Carhart*'s next paragraph proves that reading to be wrong:

> The cited cases, reaffirmed in *Casey*, recognize that a State cannot subject women's health to *significant risks* both in [the context of health threats created by pregnancy], and also where state regulations force women to use riskier methods of abortion.  Our cases have repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed *significant health risks*.  They make clear that a risk to a women's [sic] health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely.  Our holding does not go beyond those cases, as ratified in *Casey*.

*Carhart*, 530 U.S. at 931 (emphasis added and omitted).  Not only does this passage clarify the preceding dictum, it also firmly recasts the Court's previous decisions in the "significant health risk" mold.  Therefore, we think the plaintiffs greatly exaggerate the significance of the isolated phrase quoted above and ignore *Carhart*'s self-professed limitations.  Most importantly, *Carhart* cautions that it neither extends nor departs from *Casey*. *Id.* at 931, 938.  Moreover, because Nebraska made an absolute, negative claim about the relative safety of D & X, the Court needed only to satisfy itself that the evidence indicated that a maternal health exception might be necessary in some circumstances.  For these reasons, *Carhart*'s narrow holding regarding the basic need for a health exception should not be mistaken for a broad decision that would clash with *Casey*'s express endorsement

of a health exception triggered only by "'significant threat[s] to the life or health of a woman.'" *Casey*, 505 U.S. at 880 (citation omitted).

Despite the plaintiffs' stated fears, our decision does not conflict with our earlier holding in *Voinovich*, 130 F.3d 187. In *Voinovich*, we struck down, among other provisions, Ohio's post-viability *ban* of *all* abortions because the statute did not allow a post-viability abortion "where necessary to prevent a serious non-temporary threat to a pregnant woman's mental health." *Id.* at 209. To reach this result, we distinguished *Casey* on the ground that it involved regulations that merely delayed abortions, not a law that banned abortions outright. *Id.* at 208. The plaintiffs contend that the same distinction applies here, because the Act is a "ban," not simply a "regulation."[1] Apart from the patent superficiality of this argument, the plaintiffs fail to appreciate that we limited our holding in *Voinovich* to "*serious*[,] *non-temporary*" and "*severe*[,] *irreversible*" threats to mental health. *Id.* at 209 (some emphasis added). And we did so precisely because "[t]he State's substantial interest in potential life must be reconciled with the woman's constitutional right to protect her own life and health." *Id.* at 209-10. Now, in continuing respect for the constitutional validity of maintaining this difficult balance, we conclude that *Casey* and *Carhart* require a maternal heath exception that permits the banned procedure when necessary to prevent a significant health risk.

---

[1] The Ohio statute we are reviewing here restricts only one procedure, and does not purport to ban all post-viability abortions. Hence, contrary to the dissent's reasoning, dissent at Section II., our holding in *Voinovich* regarding the lack of a mental health exception does not apply. Even if it did, a plaintiff would have to demonstrate that she would suffer severe and irreversible mental harm from being limited to a D & E procedure when she or her physician might prefer a D & X. The dissent thus misunderstands the issue and overlooks the fact that there is no evidence in the record that such mental harm is even possible, let alone likely.

The question remains whether Ohio's maternal health exception achieves what *Casey* and *Carhart* require. Before examining the Act's provisions, we pause to recognize our duty to "resort[]" to "every reasonable construction . . . in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (internal quotation marks and citation omitted); *see also Frisby v. Schultz*, 487 U.S. 474, 483 (1988); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937); *Buchman v. Bd. of Educ.*, 652 N.E.2d 952, 960 (Ohio 1995). In addition, statutes restricting abortion no longer warrant strict scrutiny, *Casey*, 505 U.S. at 871-77, and the attendant presumption against constitutionality. Moreover, we cannot ignore the difficulty of legislating against a backdrop of constitutional standards that invite state regulation with one hand while barring it with the other. Compounding this difficulty in the abortion context are the unique rules governing facial challenges, under which "even a few" unconstitutional applications may doom a state's attempt to regulate the practice. *Voinovich*, 130 F.3d at 196; *see also Casey*, 505 U.S. at 894-95. And finally, we suffer from a serious institutional disability in a case in which vitally important issues turn on medical facts, yet the record consists mainly of the conflicting opinions of highly interested, even ideologically motivated, experts. All these considerations compel us, if possible, to interpret Ohio's maternal health exception in a manner that will "avoid constitutional difficulties." *Frisby*, 487 U.S. at 483.

To repeat, the Act permits the partial birth procedure when "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(B), (C). The Act defines "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible

impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.15.1(A)(5).

In our view, this exception allows physicians to perform the partial birth procedure whenever the procedure is necessary to protect the mother from significant health risks, including those which embody comparative safety concerns. To be sure, Ohio's health exception, like other "exceptions," does not always apply. Its terms clearly exclude negligible risks, trivial complications, and circumstances having nothing to do with the health of the particular patient. Thus, consistent with *Carhart*, 530 U.S. at 938, the exception does not apply when the choice of methods is dictated purely by the preference of an individual physician. But when a woman's actual medical condition makes the partial birth procedure necessary to prevent a significant health risk, the health exception applies. Likewise, the exception is triggered when other procedures, relative to the partial birth procedure, would expose a woman to significant risks. Contrary to the dissent's suggestion, the Act does not require a preexisting complication that threatens a pregnant woman's health. Rather, through its use of the prospective terms "endangered" and "risk," the Act makes clear that the exception applies if a pregnant woman's circumstances are such that her physician, in reasonable medical judgment, believes that failure to use the partial birth procedure will lead to a complication causing substantial or irreversible impairment of a major bodily function.

This understanding of the Act's maternal health exception flows naturally from its close resemblance to the exception upheld in *Casey*, 505 U.S. at 880, and from *Carhart*'s admonition that physicians are not entitled to "unfettered discretion in their selection of abortion methods," *Carhart*, 530 U.S. at 938 (internal quotation marks and citation omitted). At the same time, the Act's health exception is tethered to the developing state of medical knowledge, giving it the flexibility needed to "tolerate responsible differences of medical opinion." *Id.* at 937. Moreover, because the Act, unlike the law struck down in *Carhart*, evinces an undeniable

concern for maternal health, we will neither assume that Ohio intended to expose women to significant health risks nor strain to read the Act into unconstitutionality when it is our duty to do otherwise.

In notable contrast to the plaintiffs in *Casey*, 505 U.S. at 880, the plaintiffs here do not even attempt to identify any specific medical circumstance that demonstrates the inadequacy of Ohio's maternal health exception. Instead, along with *amicus* American College of Obstetricians and Gynecologists, they assert the much broader claim that states may not regulate among safe abortion techniques. However, if taken to its next logical step—not even its logical "extreme"—this proposition would prevent states from restricting a procedure in which a fully intact, near-viable infant is delivered alive and then killed, or allowed to expire, completely outside the mother. Indeed, one of the plaintiffs' experts, Dr. Cassing Hammond, confirmed at trial that he would prefer, if possible, to "remove the fetus totally intact every time and bring about its demise after it had been delivered." While the plaintiffs may disagree, we believe that the Constitution would not prevent a state from regulating such a practice when safe alternatives exist.

We therefore hold that the Act's health exception adequately protects maternal health. Because states face greater constitutional obstacles when regulating abortion before viability, we have focused our analysis on the Act's pre-viability effect. As the Supreme Court has explained, "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe*, 410 U.S. at 164-65. Given Ohio's authority to prohibit abortion after viability, we need not consider separately the identically worded health exception for post-viability abortions. Ohio Rev. Code Ann. § 2919.15.1(B). Our decision to uphold the Act's maternal

health exception applies with equal force to both components of the statute.

### B.  Definition of "Partial Birth Procedure"

In its permanent injunction ruling, *Women's Med.*, 162 F. Supp. 2d at 937-38, the district court did not address the issue whether the Act imposes an undue burden on the pre-viability abortion right by defining the "partial birth procedure" so as to sweep in the commonly used D & E procedure. In the preliminary injunction ruling, however, the district court considered the question and held, in Ohio's favor, that the Act does not unduly burden the abortion right. *Women's Med.*, 114 F. Supp. 2d at 683. Both parties ask us to reach the issue. And so, because we operate here with the benefit of full briefing by the parties, a fully developed factual record, and a district court ruling, albeit one made at the preliminary injunction stage, we see no reason to reserve decision.

We begin with the statute itself, and then examine the plaintiffs' claim that its terms violate the Fourteenth Amendment. The Act defines "partial birth procedure" as "the medical procedure that includes all of the following elements in sequence":

(a) Intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

(b) In a breech presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;

(c) Intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the

fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

(d)  Completion of the vaginal delivery of the fetus.

Ohio Rev. Code Ann. § 2919.15.1(A)(3).

The plaintiffs contend, primarily, that subsection (b) renders the description unconstitutional because it includes procedures involving "intentional extraction of at least the lower torso *to the navel*." Ohio Rev. Code Ann. § 2919.15.1(A)(3)(b) (emphasis added). According to the plaintiffs, many traditional D & E procedures involve intact extraction to the navel. Ohio responds that the Act draws an unmistakable distinction between the partial birth procedure and the traditional D & E. The question, then, is whether the Act's description of the partial birth procedure encompasses the commonly used D & E procedure and therefore imposes an undue burden on a mother's right to abort a non-viable fetus.

*Carhart*'s second holding is that Nebraska's law is unconstitutional because it could apply to the D & E procedure, in that its terms prohibit procedures involving the delivery of "'a substantial portion'" of a living fetus. 530 U.S. at 938 (quoting Neb. Rev. Stat. Ann. § 28-326(9) (Supp. 1999)). Because, *Carhart* holds, "a substantial portion" fails to distinguish "between D & E (where a foot or arm is drawn through the cervix) and D & X (where the body up to the head is drawn through the cervix)," *Carhart*, 530 U.S. at 938-39, the law "has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus,'" *id.* at 938 (quoting *Casey*, 505 U.S. at 877). Thus, the vagueness of the phrase "substantial portion" rendered Nebraska's law susceptible to application against physicians performing D & E procedures as well as D & X procedures.

The Court notes, however, that Nebraska might have fared better if its description of the procedure had "track[ed] the medical differences between D & E and D & X," "provide[d] an exception for the performance of D & E and other abortion procedures," or focused on the distinction between intact extraction and dismemberment. *Carhart*, 530 U.S. at 939. As we shall discuss, *infra*, the Ohio legislature, with remarkable prescience (given that the Act was written and adopted prior to *Carhart*), has done precisely what the *Carhart* Court thought the Nebraska legislation fatally failed to do.

Along similar lines, in *Voinovich*, we invalidated Ohio's previous attempt to ban partial birth abortions on the ground that the statute imposed an undue burden by defining D & X as "'the termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain.'" 130 F.3d at 198-201 (quoting Ohio Rev. Code Ann. § 2919.15(A) (repealed 2000)). Although Ohio's law was not vague in this respect, it clearly failed to distinguish between D & E and D & X, since D & E procedures sometimes require suction removal of a fetus's skull contents. *Voinovich*, 130 F.3d at 199. We also pointed out that Ohio's statute excluded the suction curettage and suction aspiration procedures, but not the D & E procedure. *Id.* at 200.

As we have said, in the present statute, the Ohio General Assembly avoided the flaws identified in *Carhart* by precisely describing the restricted procedure and explicitly permitting D & E procedures. The Act provides: "This section does not prohibit the suction curettage procedure of abortion, the suction aspiration procedure of abortion, or the *dilation and evacuation procedure of abortion*." Ohio Rev. Code Ann. § 2919.15.1(F) (emphasis added). A separate provision clarifies that the phrase, "'[d]ilation and evacuation procedure of abortion' does not include the dilation and extraction procedure of abortion." Ohio Rev. Code Ann. § 2919.15.1(A)(1). Thus, even though the Act was drafted without the benefit of *Carhart*'s subsequent observation that

"it would have been a simple matter . . . [for Nebraska] to provide an exception for the performance of D & E and other abortion procedures," 530 U.S. at 939, the Ohio General Assembly saw the need to secure, by means of an explicit exception, the continued availability of traditional D & E abortion procedures.

Although the plaintiffs criticize the Act's failure to define "dilation and evacuation," courts have explained repeatedly that the principal distinction between D & X and D & E is *intactness*: D & X maximizes intactness and D & E requires dismemberment prior to removal of the fetus. *See*, *e.g.*, *id.* at 927, 939; *Voinovich*, 130 F.3d at 199; *Hope Clinic v. Ryan*, 195 F.3d 857, 861 (7th Cir. 1999), *vacated*, 530 U.S. 1271 (2000). The plaintiffs' criticism is even more remarkable because at the preliminary injunction hearing in this case, Dr. Haskell confirmed that he actually "coined the term 'dilation and extraction' or 'D&X' *to distinguish it* from the dismemberment-type D&E." (Emphasis added.) From its inception, then, the label "dilation and extraction," or "D & X," has been intended to allow physicians, much less legislators, to distinguish between intact abortion procedures and those procedures that require dismemberment prior to removal of the fetus. The Act invokes this well-established distinction by excluding D & E in section 2919.15.1(F) and separating D & X from D & E in section 2919.15.1(A)(1). Accordingly, regardless of whether a procedure involves "intentional extraction of at least the lower torso to the navel," Ohio Rev. Code Ann. § 2919.15.1(A)(3)(b), it is not prohibited by the Act if it requires dismemberment of the fetus prior to removal of the fetal parts "in several passes," *Carhart*, 530 U.S. at 927. Moreover, the Act does not prohibit all intact abortion procedures. The sequential description contained in section 2919.15.1(3) ensures that the law, in the case of a breech presentation, applies only if the intentional act causing the fetus's death occurs after intact extraction to the navel. In the case of a cephalic presentation, there is no question that the Act does not restrict the D & E method.

In contrast to the situation in *Carhart*, 530 U.S. at 940-45, Ohio does not urge us to replace a vague, offending, statutory phrase like "substantial portion" with a conflicting phrase like "body up to the head." The Act, as written, carefully describes the restricted procedure and explicitly excludes other procedures; our interpretation gives meaning to the restriction and the exclusion. We therefore have no difficulty fulfilling our twin obligations to "give effect, if possible, to every clause and word of a statute," *Moskal v. United States*, 498 U.S. 103, 109-10 (1990) (internal quotation marks and citations omitted), and to construe statutes, when possible, so as to "avoid constitutional difficulties." *Frisby*, 487 U.S. at 483.

Accordingly, because the Act does not restrict the most commonly used procedure for second trimester abortions and because the statute provides an exception for significant health risks, we conclude that it does not impose an undue burden on a woman's right to abort a non-viable fetus.

## IV.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's judgment and **VACATE** the permanent injunction preventing enforcement of the Act.

---

## DISSENT

---

TARNOW, District Judge, dissenting. The Court must determine whether Ohio's Substitute House Bill 351 ("HB 351") provides a constitutionally adequate exception for the health of pregnant women in light of its ban on intact abortion procedures.[1],[2] The adequacy of that exception must be judged according to the constitutional requirement that abortion regulations allow exceptions when "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *See Roe v. Wade,* 410 U.S. 113, 164-165 (1973); *Planned Parenthood of S.E. Pa. v. Casey,* 505 U.S. 833, 879 (1992). For reasons summarized immediately below and discussed in the following sections, I conclude that HB 351 forces some women to use riskier methods of abortion and thus fails to meet this requirement in both its pre- and post-viability contexts. *See Stenberg v. Carhart*, 530 U.S. 914, 931 (2000).

The facial challenge here presents two central questions: 1) What is the constitutional standard for judging the adequacy of a health exception to preserve a woman's health where a particular method of abortion has been banned? *and*

---

[1] The parties have also asked the Court to determine whether HB 351 sweeps within its ban the "D&E" procedure, thereby placing an undue burden on women who seek an abortion before the fetus attains viability. For the reasons stated by the district court in its preliminary injunction ruling, I agree that HB 351 does not sweep the D&E procedure within its reach. *See Women's Med. Prof'l Corp. v. Taft*, 114 F. Supp. 2d 664, 683-85 (S.D. Ohio 2000).

[2] I will use the terms "intact procedure" and "intact method" interchangeably, each signifying what is entailed by the terms "D&X" method, "intact D&E" method, as well as the "partial birth procedure" defined in HB 351, Ohio Rev. Code Ann. § 2919.151(A)(3).

2) Does the specific language of the HB 351's health exception comport with this constitutional standard?

The majority concludes that a ban on the intact method is constitutional as long it contains a health exception allowing the procedure "when necessary to prevent significant, as opposed to negligible, health risks." Majority Slip Opinion at 15. Further, they conclude that HB 351's health exception meets this standard.

In terms of the *degree* of risk to be considered, I agree that a health exception is not constitutionally required for truly negligible health risks. However, when a state bans a method of abortion, it is required to permit an exception whenever a woman faces any risk to her health that is more than negligible.[3] *See Carhart*, 530 U.S. at 931; *Casey,* 505 U.S. at 880.

But more important to this case, as to a relevant *source* of risk, the Supreme Court has instructed that "a State cannot subject women's health to significant risks . . . where state regulations force women to use riskier methods of abortion." *Carhart*, 530 U.S. at 931. Thus, where a woman has a right to an abortion, the state must allow an exception for her to receive a banned method of abortion when it offers a non-negligible safety advantage over other methods.

As to whether HB 351's health exception meets this standard, the majority offers a construction that is at odds with the plain wording of the statute. In fact, HB 351 allows an exception only when a woman is endangered by a "medically diagnosed condition that . . . complicates the

---

[3]Thus, the word "significant," as in the phrase "significant risk," must be taken to mean "non-negligible." In fact, "negligible risks" and "trivial complications," *see* Majority Slip Opinion at 23, are irrelevant to this case. I will therefore use and interpret the word "risk" to mean "non-negligible risk." Likewise, I will use and interpret the word "riskier" to mean "riskier by a non-negligible amount."

pregnancy." Ohio Rev. Code Ann. § 2919.151(B) (post-viability) and (C) (pre-viability); Ohio Rev. Code Ann. § 2919.151(A)(5) (statutory definition). Thus it does not allow the intact procedure for a *healthy* woman. When the fetus has not yet attained viability, a healthy woman, like any woman, has a constitutional right to obtain an abortion without being forced to use a riskier procedure. *See Carhart*, 530 U.S. at 931. Because the record shows that the intact method may entail significantly less risk than other methods, HB 351's pre-viability ban is unconstitutional.

HB 351's failure to address comparative health risks extends also to women for whom a continuing pregnancy or bearing a child would impose a risk of severe and irreversible mental harm. As Ohio stated in the proceedings below, HB 351's health exception encompasses only risks to a woman's *physical* health. This admission comports with the language of the health exception requiring a risk of impairment to "a major *bodily* function." Ohio Rev. Code Ann. § 2919.151(B) (post-viability) and (C) (pre-viability); Ohio Rev. Code Ann. § 2919.151(A)(5) (statutory definition) (emphasis added). However, the Supreme Court has made clear that a woman's *mental* health must be considered a part of her overall health when a state regulates abortion. *See Doe v. Bolton*, 410 U.S. 179, 191-192 (1973). In accord with this principle, this Court has stated that a health exception must encompass a risk of a serious and irreversible harm to the woman's mental health. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 209 (6th Cir. 1997), *cert. denied*, 523 U.S. 1026 (1998). Under HB 351, a woman facing a risk of severe and irreversible harm to her mental health would not have access to the intact procedure and would thus be compelled to face the greater physical risks that attend other methods of abortion. This result violates *Carhart*'s instruction that a woman may not be forced to use riskier methods of abortion. *See Carhart*, 530 U.S. at 931. Because HB 351 fails to encompass these risks both before and after fetal viability, it is unconstitutional in both contexts.

For these reasons, I believe the district court's decision should be affirmed. Thus, I respectfully dissent.

## I. HB 351's Pre-Viability Ban is Unconstitutional Because It Forces Healthy Women to Use Riskier Methods of Abortion

### A.   The Constitution forbids regulations that force women to use riskier methods of abortion

In *Roe,* the Supreme Court held that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 410 U.S. at 164-165.[4] That holding has been consistently reiterated. *See, e.g.*, *Casey*, 505 U.S. at 879; *Carhart*, 530 U.S. at 930. Further, because the State's interest in regulating abortion before fetal viability is much weaker, "the law . . . at a minimum requires the same in respect to previability regulation." *Carhart*, 530 U.S. at 930 (citing *Casey*, 505 U.S. at 880; *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

The meaning of the critical phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother" has been clarified by a long line of Supreme Court cases, including *Carhart*, *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747 (1986) (*overruled in part by Casey*, 505 U.S. at 870), *Colautti v. Franklin*, 439 U.S. 379 (1979), and *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976). The case that is both most recent and relevant is

---

[4]Modifying *Roe*, *Casey* held that prior to fetal viability, a woman has a right to an abortion without an "undue burden" from the state. 505 U.S. at 874-78. In addition, *Casey* reaffirmed the "substantial state interest in potential life throughout pregnancy." *Id.* at 876. These central principles also inform the discussion of the adequacy of HB 351's health exception.

*Carhart*. In striking down a Nebraska statute prohibiting the intact procedure without any exception for the pregnant woman's health, the Court reaffirmed and explained its rationale behind the preservation standard.

> [T]he governing standard requires an exception "where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother," for this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion.

*Carhart*, 530 U.S. at 931 (citing *Casey*, 505 U.S. at 879; *Thornburgh*, 476 U.S. at 768-769; *Colautti*, 439 U.S. at 400; *Danforth,* 428 U.S. at 76-79; *Doe*, 410 U.S. at 197).

*Carhart* also reaffirmed that the relevant dangers to a woman's health are not limited to those created by the pregnancy itself.

> [A] State cannot subject women's health to significant risks both [where the pregnancy itself creates a threat to health], *and also* where state regulations force women to use riskier methods of abortion. Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's [sic] health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely.

*Id.* at 931 (emphasis in original). It is clear then that where a constitutional right to an abortion exists, a state may not "force women to use riskier methods." In short, the comparative risks between methods are of constitutional import, just as are risks stemming from a woman's immediate medical condition.

The Court also found that the comparative risks at issue for a ban on the intact procedure are not negligible.

The State fails to demonstrate that banning D & X without a health exception may not create significant health risks for women, because the record shows that significant medical authority supports the proposition that in some circumstances, D & X would be the safest procedure.

*Id.* at 932. Thus, the Court states that because significant medical authority shows the D&X procedure to be the safest method in some circumstances, banning the procedure will necessarily create significant health risks for some women. This conclusion follows from factual findings accepted by the Court regarding the safety advantages of the intact procedure. *See id.* at 932. Moreover, it also follows from the fact that a woman who seeks an abortion at the relatively late stage of fetal development where the D&X procedure becomes relevant will necessarily face significant health risks. In short, the serious risk inherent to late term procedures means that the safety advantages offered by the intact method are not negligible. This fact supports the standard allowing a woman to receive the safest procedure, and renders irrelevant the majority's discussion of "marginal or insignificant risks." Majority Slip Opinion at 18.[5]

---

[5] In its focus on "negligible risks" and "trivial complications," *see* Majority Slip Opinion at 23, the majority miscasts the plaintiffs' arguments and the district court's ruling. Neither contend that a health exception must accommodate negligible risks. The district court states "the plain language of HB 351 does not allow the 'partial birth procedure' to be performed when it is simply safer than alternative methods of abortion, and *that* is what *Carhart* requires." *Women's Med. Prof'l Corp. v. Taft,* 162 F. Supp. 2d 929, 940-41 (2001). The district court does not use the phrase "simply safer" in isolation to mean "an iota safer." Rather, the court uses the word "simply" to modify the whole phrase "safer than alternative methods of abortion." As this context makes clear, the court refers to the source of risk, not the degree of risk. Indeed, in accord with the district court's findings about the comparative safety of the intact

---

Further, given the Supreme Court's instruction that the health preservation standard does not require an "absolute necessity" for the medical procedure nor does it require "unanimity of medical opinion," health risks may be assessed as being significant because "[d]octors often differ in their estimation of comparative health risks." *Carhart,* 530 U.S. at 937.

Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences.

*Id.* Thus, in this context where the attendant health risks of abortion are already significant, and doctors reasonably disagree as to comparative safety of available methods, a "safer abortion method in certain circumstances" will help diminish the risk of "tragic health consequences." With these principles and findings, the Court instructs that the intact procedure must be permitted when it may be the safer procedure for the woman.[6]

---

procedure, this is not a case about negligible risks. *See id.* at 941-952.

[6] In further support of this conclusion, it should be noted that the Court found irrelevant or unpersuasive Nebraska's contention that "safe alternatives remain available" despite the ban. *See Carhart*, 530 U.S. at 931-32. Further, the Court cited as relevant the conclusion of a panel of the American College of Obstetricians and Gynecologists that the intact procedure "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman." *Id.* at 932.

*Carhart*'s underlying rationale that "a State may promote but not endanger a woman's health when it regulates the methods of abortion" is not *dicta*, as the majority suggests. *See* Majority Slip Opinion at 20.  This principle in fact lies at the core of a line of cases leading up to *Carhart*. For example, in *Danforth*, the Supreme Court invalidated a ban on saline induction abortions because the record demonstrated its safety advantage over other available methods. The ban was held unconstitutional in part because it "force[d] a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed." *Danforth*, 428 U.S. at 78-79.

Later, in *Thornburgh*, the Court examined a Pennsylvania law concerning post-viability abortions that required the physician to choose an abortion procedure that "would provide the best opportunity for the unborn child to be aborted alive" unless that method "would present a significantly greater medical risk to the life of health of the pregnant woman" than another available method. 18 Pa. Cons. Stat. § 3210(b) (1982). The Court found the statute unconstitutional because it required the pregnant woman "to bear an increased medical risk in order to save her viable fetus." *Thornburgh*, 476 U.S. at 769.

*Thornburgh*'s holding accords with the Court's earlier decision in *Colautti*, where the Court expressed its concern over a similar provision in Pennsylvania's Abortion Control Act that required physicians aborting potentially viable fetuses to use a technique to maximize the fetus's chance for survival. The Court invalidated the provision on grounds of vagueness because it could be read to "require[] the physician to make a 'trade-off' between the woman's health and additional percentage points of fetal survival." *Colautti*, 439 U.S. at 400. Thus, far from being *dicta*, the principle that "a State may promote but not endanger a woman's health when it regulates the methods of abortion" has in fact guided the decisions of the Supreme Court for more than twenty years.

*Carhart* and its antecedents make clear that when a woman holds a constitutional right to obtain an abortion, the state may not force her to use riskier methods of abortion. *Carhart*, 530 U.S. at 931. In light of the rights outlined in *Roe* and *Casey*, therefore, a woman must be permitted to choose the safest available method when the fetus is not viable and also at any time the woman's health is endangered by a continuing pregnancy. This is the relevant meaning of the Supreme Court's pronouncement that "a State may promote but not endanger a woman's health when it regulates the methods of abortion." This is what is required in a state's constitutional obligation to ensure the "preservation of the life or health" of the woman.

**B.   The facts of this case and others show that other methods of abortion may be riskier than the intact method and that causing fetal demise in advance may add significant risk to the intact method**

Given the foregoing constitutional standard, it is necessary to consider whether "a significant body of medical opinion believes [that the intact procedure] may bring with it greater safety for some patients, and explains the medical reasons supporting that view." *Carhart*, 530 U.S. at 937. This inquiry is relevant to HB 351's pre- and post-viability bans because the intact procedure is performed in both contexts. *See Women's Med. Prof'l Corp. v. Taft*, 114 F. Supp. 2d at 668 (granting preliminary injunction). The medical processes entailed by the common methods of abortion, including their risks and benefits, have been extensively detailed by the district court below and others. *See Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d 929, 941-952 (S.D. Ohio 2001) (granting permanent injunction); *see also, e.g., Carhart*, 530 U.S. at 932-933, 935-936.

These sources demonstrate that the intact procedure may in fact present numerous safety advantages over other methods. *See Women's Med. Prof'l Corp. v. Taft,* 162 F. Supp. 2d at 947, 950, 951, 954 (finding that the intact method may be

safer than other methods); *see also Carhart*, 530 U.S. at 932-33 (citing numerous cases where the intact procedure was found to be the safest or most appropriate procedure). For the purposes here, these safety advantages may be summarized.

As compared to the D&E method, the district court found that the intact method may be safer. *See Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d at 949-50. This conclusion was based on evidence showing that the intact procedure may have a lower risk of: 1) infection; 2) trauma to the cervix and uterus from an increased number of passes of instruments into the uterus; and, 3) a complication known as disseminated intravascular coagulation ("DIC"), a blood clotting disorder that may be fatal. *See id.* at 948, 949, 949-50; *see also Danforth*, 428 U.S. at 96 (presenting background and risks of DIC); *Carhart*, 530 U.S. at 932 (quoting district court's finding that D&E helps prevent DIC, which is among the two most common causes of maternal death, *Carhart v. Stenberg*, 11 F. Supp. 2d 1099, 1126 (D. Neb. 1998), *aff'd*, 192 F.3d 1142 (8th Cir. 1999), *aff'd*, 530 U.S. 914 (2000)). The intact procedure may also cause less blood loss and require a shorter duration of general anesthesia, which carries its own attendant health risks including the risk of death. *See Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d at 948. Further, the intact procedure reduces the possibility of leaving fetal tissue inside the uterus. *See id.* at 950. The Court in *Carhart* similarly noted this danger, citing the complications that may arise from remaining bony fragments and retained fetal parts. 530 U.S. at 932.

The district court also found the intact procedure to be safer than the induction/instillation method of abortion. *See Women's Med. Prof'l Corp.*, 162 F. Supp. 2d at 951. The Court heard evidence that induction/instillation may present the following comparative disadvantages: 1) a protracted induction time averaging 19 hours, as compared to 15 minutes, not including the dilation period, for the intact procedure; 2) the use of a labor inducing agent known to cause nausea, vomiting, and diarrhea; 3) an increased risk of

hemorrhage and infection; and 4) an additional surgical procedure to remove a remaining placenta. *See id.* at 948, 949, 950.

As compared to hysterectomy or hysterotomy, the district court noted the obvious fact that the intact procedure was generally far less traumatic than those major surgical procedures. *See id.* at 942; *see also Planned Parenthood of Cent. New Jersey v. Farmer*, 220 F.3d 127, 145 (3rd Cir. 2000) (finding that these procedures have an "enhanced risk of morbidity and mortality to the woman due to the incidence of hemorrhage" and that hysterectomy leaves a woman sterile).

It is clear then that the intact procedure may be significantly safer in some circumstances than other available methods of abortion.[7] But because HB 351 does not in effect ban the intact procedure when the delivered fetus is already dead, *see* Ohio Rev. Code Ann. § 2919.151(A)(3)(b) and (c), the safety of procedures used to cause fetal demise must also be examined to determine whether they present non-negligible risk. The district court found that ensuring fetal death, both by injection of a feticidal agent such as digoxin and by severing the umbilical cord, increased the risk to the woman. *See Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d at 957, 958.

As to the digoxin injection, various experts testified at the district court that various complications may arise from its use, including: 1) amniotic embolism, which may be fatal; 2) bleeding and injury to the bowel; 3) piercing of other internal structures such as blood vessels and the uterus; 4) arrhythmia possibly leading to cardiac arrest for women with preexisting cardiac problems; 5) vomiting; 6) vaginal

---

[7] Contrary to the majority's assertion, neither Plaintiffs nor their expert doctors make the assertion that the intact procedure is "always safer." Majority Slip Opinion at 17.

bleeding; and, 7) other injury to the uterus requiring hospitalization. *See id.* at 956-57; *see also Carhart*, 530 U.S. at 932 (quoting district court's finding that amniotic embolism is the other of the two most common causes of maternal death, 11 F. Supp. 2d at 1126). Other courts have found similar risks. For example, in *Evans v. Kelley,* 977 F. Supp. 1283 (E.D. Mich. 1997), the court found that "injections have serious potential health risks" including those of hemorrhage, infection, and uterine necrosis. *Id.* at 1301. The *Evans* court also found that many physicians do not have the appropriate skills to perform the injection and that some women have conditions that make the injection impossible. *Id.*

As to severing the umbilical cord, the district court found that the passing of sharp instruments into the uterus increases the risk of uterine perforation as the physician locates and severs an umbilical cord that does not spontaneously present itself. *See Women's Med. Prof'l Corp. v. Taft*, 162 F. Supp. 2d at 957. This finding is consistent with those of other courts. *See Carhart v. Stenberg,* 11 F. Supp. 2d 1099 at 1123 ("Cutting the umbilical cord and waiting for the fetus to die before completing the D & X procedure carries appreciable maternal risks, no maternal benefits, and is not always possible."); *Planned Parenthood of Cent. New Jersey v. Verniero,* 41 F. Supp. 2d 478, 500 (D.N.J. 1998) (finding risk of uterine perforation and hemorrhage from passing of sharp instruments into the uterus and generally that "[h]ealth risks to women would be significantly increased if physicians are required to ensure fetal demise in utero"), *aff'd*, 220 F.3d 127 (3rd Cir. 2000).

On these findings, it is clear then that requiring fetal demise before completion of the intact procedure may present additional risks of serious health consequences for some women.

**C.  HB 351 does not allow an exception to its ban on the intact procedure when the woman does not have a "medically diagnosed condition that . . . complicates the pregnancy," even if the intact procedure is safer than other methods**

Given that it is unconstitutional for a state to "force women to use riskier methods of abortion" and the fact that the intact method may be a safer procedure for some women, it must be determined whether HB 351 allows an exception to its ban when the intact procedure is safer than other available procedures. As the following shows, it does not.

HB 351 permits the "partial birth procedure" only when it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.151(B) (post-viability) and (C) (pre-viability). HB 351 defines the "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.151(A)(5).

Thus, HB 351's health exception will not apply when a woman who seeks the intact method is not endangered by a "medically diagnosed condition that . . . complicates the pregnancy." *Id*. In limiting its exception to pre-existing physical conditions, HB 351 fails to contemplate the increased risks imposed on a woman by other methods of abortion. No exception would be permitted for a woman who is healthy, even if the intact procedure would likely avert highly serious health risks.

The majority and defendants assert that "the exception is triggered when other procedures, relative to the partial birth procedure, would expose a woman to significant risks."

Majority Slip Opinion at 23. However, their reading conflicts with the plain language of the statute stating that a woman may not receive the intact method unless she is endangered by a "medically diagnosed condition that . . . complicates the pregnancy." Ohio Rev. Code Ann. § 2919.151(A)(5). Because an abortion *ends* a pregnancy, it is not possible to characterize a health consequence of abortion as a "medically diagnosed condition that . . . *complicates the pregnancy*." This language excludes the prospective risks of other methods of abortion, thus violating *Carhart*'s instruction. The majority ignores this part of the statute and offers a plainly unreasonable interpretation of the statute's clear language.

As noted in *Carhart*, the clear statutory definition is controlling. *See Carhart*, 530 U.S. at 942 (stating that "[w]hen a statute includes an explicit definition, we must follow that definition"). Likewise, the Court in *Colautti* noted that "[a]s a rule, a definition which declares what a term means . . . excludes any meaning that is not stated." 439 U.S. at 392-93 n.10 (quotation and citation omitted). Despite our duty to attempt to construe statutes to preserve their constitutionality, *see Frisby v. Schultz*, 487 U.S. 474, 483 (1988), such is not possible here in light of the statute's unambiguous wording.

**D. HB 351's pre-viability ban fails to provide a constitutionally adequate exception to preserve the health of a woman who does not have a medically diagnosed condition that complicates the pregnancy**

The foregoing establishes the following:

1) it is unconstitutional for a state to maintain regulations that "force women to use riskier methods of abortion" when a woman has a constitutional right to abortion, *viz.*,
    a) when the fetus is not viable; and,
    b) whenever a continuing pregnancy would threaten the woman's life or health;

2) substantial medical evidence shows that intact procedure may pose a lesser risk to some women;

3) the common methods of causing fetal demise may add significant risk to an abortion procedure and offer no benefit to the pregnant woman; and,

4) HB 351 does not permit a health exception for the intact procedure when it poses less risk to a pregnant woman who does not have a medically diagnosed condition that complicates the pregnancy.

Taken together, these findings and conclusions show that HB 351's pre-viability ban is unconstitutional because it does not allow an exception for a woman who faces heightened risks from other methods but who does not have a medically diagnosed condition complicating the pregnancy. In the pre-viability context, the exception's limiting conditions render it unconstitutionally narrow.[8] HB 351's pre-viability ban fails to offer the protection necessary to ensure the "preservation of the life or health" of the pregnant woman and is therefore unconstitutional.

---

[8]In the post-viability context, the state may proscribe abortion altogether, except where the woman's health is threatened by a continuing pregnancy. *See Roe,* 410 U.S. at 164-165; *Casey,* 505 U.S. at 879 (1992). Thus, the state may limit exceptions to cases where the woman has a medically diagnosed condition that complicates the pregnancy, as HB 351's health exception does. In light of our duty to offer reasonable statutory constructions to preserve constitutionality, I believe that the post-viability health exception may be read to apply when the woman has a physical condition that complicates the pregnancy and the intact procedure would be the safest method of abortion. In such a case, HB 351's post-viability ban would not violate *Carhart*'s prohibition of abortion regulations that force women to use riskier methods of abortion. Nonetheless, as discussed in the following section, both the pre- and post-viability bans are unconstitutional because the exception fails to apply when the woman faces a serious risk to her *mental* health from a continuing pregnancy and the intact procedure would be the safest method of abortion.

## II. HB 351's Pre- and Post-viability Bans Are Unconstitutional Because They Force Women Facing Severe and Irreversible Harm to Their Mental Health to Use Riskier Methods of Abortion

As discussed above, HB 351's pre-viability ban is unconstitutional because it forces a woman who does not have a "medically diagnosed condition that . . . complicates the pregnancy" to use riskier methods of abortion. But there is another circumstance in which HB 351 would force a woman to use riskier methods of abortion, *viz.* when a continuing pregnancy or bearing a child would present a risk of severe and irreversible harm to the woman's *mental* health. Because HB 351 limits its exception to risks from pre-existing *physical* conditions, it fails to allow an exception where the risks are to the woman's mental health. As discussed below, this failure renders HB 351 unconstitutional in both its pre- and post-viability contexts.

### A. Both the Supreme Court and this Court have recognized that a woman's mental health must be preserved as part of her overall health

Since the day *Roe* was decided, the Supreme Court has recognized the emotional and psychological aspects of a woman's overall health. To determine whether an abortion is medically "necessary," the Court in *Doe* stated that "medical judgment may be exercised in the light of all factors—physical, *emotional, psychological,* familial, and the woman's age—relevant to the well- being of the patient. *All these factors may relate to health.*" *Doe*, 410 U.S. at 191-192 (emphasis added). Decided on the same day and meant "to be read together," *id.* at 165, *Doe* and *Roe* indicate that a woman's *mental* health, in addition to her physical health, must be considered in assessing whether an exception to an abortion regulation actually preserves the health of the pregnant woman.

This Court has specifically held so, stating that in the post-viability context, a maternal health exception must encompass a risk of severe and irreversible harm to the woman's mental health. *Voinovich*, 130 F.3d at 209-210. The Court stated:

> The State's substantial interest in potential life must be reconciled with the woman's constitutional right to protect her own life and health. We believe that in order to reconcile these important interests, the Constitution requires that if the State chooses to proscribe post-viability abortions, it must provide a health exception that includes situations where a woman is faced with the risk of severe psychological or emotional injury which may be irreversible.

*Id.* at 210. The *Voinovich* court also found that the health exception at issue there unconstitutionally limited "the physician's discretion to determine whether an abortion is necessary to preserve the woman's health, because it limits the physician's consideration to physical health conditions." *Id.* (citing *Colautti*, 439 U.S. at 387). Thus, it must be determined whether some women face risks of severe and irreversible harm to their mental health and whether HB 351's health exception would encompasses such risks.

### B. The facts of this case show that some women face a risk of severe and irreversible mental harm from a continuing pregnancy or bearing a child

The record makes clear the factual bases for concern over the mental health conditions of some pregnant women. Plaintiffs' psychological expert testified that certain women face very significant mental health risks from a continuing pregnancy or bearing a child. Women who may face such risk include victims of rape, incest, and other kinds of abuse, and those with severe emotional disorders such as severe depression, obsessive-compulsive disorder, and manic-depressive illness. *See* J.A. at 954, 957-58, 973-77; *see also Women's Med. Prof'l Corp. v. Voinovich*, 911 F. Supp. 1051,

1078-1081 (S.D. Ohio 1995) (listing examples of relevant psychological harms), *aff'd*, 130 F.3d 187 (6th Cir. 1997). Thus, although the district court did not make detailed findings on risks to mental health in this case,[9] the record clearly shows that some women face very serious mental health risks from a continuing pregnancy. *See Voinovich*, 130 F.3d at 192 ("[A]n appellate court is to conduct an independent review of the record when constitutional facts are at issue.") (citing *Jacobellis v. Ohio,* 378 U.S. 184, 190 & n.6 (1964)).

**C. HB 351 does not allow an exception to its ban on the intact procedure when the woman faces a risk of severe and irreversible harm to her mental health, even if the intact procedure is safer than other methods**

HB 351 will permit the intact procedure only when it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by" a "medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev. Code Ann. § 2919.151(B) (post-viability) and (C) (pre-viability), incorporating Ohio Rev. Code Ann. § 2919.151(A)(5) (statutory definition). By its plain wording, then, the

---

[9] In granting a preliminary injunction, the district court found a substantial likelihood that HB 351 was unconstitutional because it failed to encompass risks of severe and irreversible harm to a woman's mental health. *See* 114 F. Supp. 2d at 696. In granting the permanent injunction, however, the district court chose not to reach the issue concerning an exception for mental health risks because the court found HB 351 to be unconstitutional in both the pre- and post-viability contexts. *See* 162 F. Supp. 2d at 962, n.31. Nonetheless, this Court may affirm the district court's judgment on any basis supported by the record. *See Andrews v. Ohio*, 104 F.3d 803, 808 (6th Cir.1997).

exception will apply only if all of the following conditions are met:

1) there is a danger to the pregnant woman's life or health;

2) the danger arises from a medically diagnosed condition;

3) the medically diagnosed condition complicates the pregnancy;

4) the complication directly or indirectly causes a substantial and irreversible impairment; and,

5) the impairment is of a major bodily function.

As to whether the exception would apply for a woman facing a risk of severe and irreversible mental harm, it is clear that the first four of the five conditions would be met.[10] However, the fifth condition that the impairment be of "a major bodily function" does not appear to be met when the serious risk is purely to the woman's mental health. Indeed, in considering the substantially similar health exception in *Voinovich*,[11] this Court stated that "[o]n its face, this definition appears to be limited to physical health risks, as opposed to mental health risks." *Voinovich*, 130 F.3d at 206. The same is true here. In fact, the defendants have admitted

---

[10] As to the third condition, I assume that severe mental health risks, like physical health risks, may be "medically diagnosed" by a doctor, psychiatrist, or other mental health professional. The first, second, and fourth conditions obviously apply in this context.

[11] The relevant provision in *Voinovich* proscribed all post-viability abortions except where "a physician determines, in good faith and in the exercise of reasonable medical judgment, that the abortion is necessary to prevent the death of the pregnant woman or a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman." Ohio Rev. Code Ann. 2919.17(A)(1) (1996).

that the exception is limited to *physical* health risks. *Women's Med. Prof'l Corp. v. Taft*, 911 F. Supp. at 960. The Ohio defendants admitted the same with respect to the highly similar provision in *Voinovich*. 130 F.3d at 206-207.[12] Thus, the health exception cannot be understood to encompass mental health risks and conditions, regardless of their nature or severity.

A woman facing a risk of severe and irreversible mental harm would not be permitted to receive the intact procedure. While the woman would still be able to receive an abortion by another method, she would nonetheless be compelled to face the comparative risks that HB 351 unconstitutionally fails to encompass. *See* Dissenting Slip Opinion at 33-45. Thus, no exception would extend to a woman who faces a severe and irreversible risk to her mental health from a continuing pregnancy, even when the intact procedure would carry significantly less physical risk than other procedures.[13]

**D.   HB 351's pre- and post-viability bans fail to provide a constitutionally adequate exception to preserve the health of a woman who faces a risk of severe and irreversible harm to her mental health**

The foregoing establishes that HB 351 is unconstitutional because it fails to encompass comparative physical risks and risks of severe and irreversible harm to a woman's mental

---

[12]As in *Voinovich*, this admission forecloses the argument that mental health is a component of the "major bodily function" of the brain. *See Voinovich*, 130 F.3d at 209 n.20 (citing *A Woman's Choice-East Side Women's Clinic v. Newman,* 671 N.E.2d 104 (Ind.1996)).

[13]In light of the serious physical and mental harms for which HB 351 fails to account, it cannot be said that this case is about the mere "preferences" of doctors. *See* Majority Slip Opinion at 14-15. Plaintiffs have not argued "that a health exception, to be constitutional, must give physicians complete freedom to perform abortions using the D & X procedure whenever they wish to do so." *Id.* at 17. Plaintiffs do not seek a standardless exception.

health. As the district court stated in granting the preliminary injunction:

> Given that a State cannot prohibit a woman from aborting a viable fetus to preserve her own psychological or emotional health, it follows naturally from *Carhart* that she cannot be deprived of the safest method of doing so. Indeed, just as a woman who is suffering from a serious *physical* health condition must be permitted to undergo the safest abortion procedure available, a woman who is suffering from a *mental* health condition of the type described by this Court in *Voinovich* is entitled to no less.

114 F. Supp. 2d at 695-96 (emphasis in original) (footnote omitted). Further in contravention of *Voinovich,* HB 351 admits no discretion to the physician on this issue. *See* 130 F.3d at 210.

Contrary to the majority's assertion, the issue is not whether the woman "would suffer severe and irreversible mental harm from being limited to a D & E procedure when she or her physician might prefer a D & X." Majority Slip Opinion at 21 n.1. Rather, once it is established that a continuing pregnancy or bearing a child would pose a risk of severe and irreversible mental harm, the issue is whether the woman will be permitted to obtain an abortion by the means that presents the least risk to her physical health. *Carhart* requires such an exception, but none is afforded by HB 351.

In short, HB 351 does not provide what is explicitly required by *Carhart* and *Voinovich*. Its health exception fails to heed the Supreme Court's longstanding recognition of the importance of mental health to a woman's overall health. Though *Voinovich* held that a woman's mental health must be considered with respect to a post-viability ban, that holding also applies in the pre-viability context because "the law . . . at a minimum requires [preservation of the woman's health] in respect to previability regulation." *Carhart*, 530 U.S. at

930. The majority's contrary assertion is unavailing. *See* Majority Slip Opinion at 21 n.1. Indeed, it would be illogical to force a woman–for example, a woman impregnated by rape or incest–to wait until the fetus attained viability before recognizing the risk to her mental health from a continuing pregnancy or giving birth. Thus, in both the pre- and post-viability contexts, HB 351 is unconstitutional because it forces women confronting the risk of severe and irreversible mental harm to use riskier methods of abortion. *See Carhart*, 530 U.S. at 931.

### III. The Health Exception Approved in *Casey* Is Constitutionally Inadequate for HB 351

In an attempt to save the constitutionality of HB 351, the defendants make much of the similarity between the provisions of HB 351's health exception and the health exception to the general abortion regulations at issue in *Casey*.[14] In essence, they argue that the health exception must be constitutionally adequate because its provisions mirror those approved in *Casey*, as construed broadly by the Third Circuit. *See* 947 F.2d 682, 701 (1991). However, Ohio's attempt to import the provisions of Pennsylvania's health exception into HB 351 fails because the Ohio law is very different in nature. As this Court noted in *Voinovich*, there is an important difference between regulations such those as in *Casey* that merely *delay* abortions and those at issue here and in *Voinovich* that *ban* some abortions. *See* 130 F.3d at 208.

---

[14]The statute in *Casey* allowed exceptions to its regulations in cases of "medical emergency," defined as:

[t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

18 Pa. Cons. Stat. § 3203 (1990).

In *Casey*, one of the main regulations at issue delayed the legal provision of an abortion until 24 hours after a woman had given her informed consent. 18 Pa. Cons. Stat. § 3205 (1990). It is obvious that requiring a 24-hour delay imposes a far lesser restriction and risk on a woman than a ban on a method of abortion. Unlike the regulations at issue in *Casey*, a ban with an overly narrow health exception does not have a mere "incidental effect of increasing the cost or decreasing the availability of medical care." *Casey*, 505 U.S. at 874. Further, HB 351's ban is not a "structural mechanism," *id.* at 877, that asks a woman to stop and think about her choice; it is a ban whose narrow exception substantively forecloses a woman's right in some circumstances to receive the type of procedure that is safest for her. Unlike HB 351, *Casey*'s regulations did not "force women to use riskier methods of abortion." *Carhart*, 530 U.S. at 931. This is the crucial distinction between the regulations at issue in *Casey* and the regulations in *Carhart*, where Court underscored its longstanding concern regarding state regulations that ban a method of abortion: "Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks." *Id.* (emphasis in original).

Another important distinction between the regulations in *Casey* and *Carhart* likewise arises from the different circumstances in which their respective exceptions might become relevant. In *Casey*'s relevant context, when a woman's health condition is such that she needs an abortion to be performed within only 24 hours of seeking one, her need will almost certainly be severe enough to trigger the "medical emergency" exception. However, in the unframed context of HB 351's narrowly excepted ban, no passing of time would allow the woman to obtain the intact procedure, even though it might be a significantly less risky procedure than other available methods.

This fatal flaw itself derives from the forced fit of Pennsylvania's exception unto Ohio's ban of the intact

procedure. The health exception in both sets of regulations would be triggered only by a "condition" that "complicates the pregnancy." For a general 24-hour waiting period, one may understand the rationale behind the exception's specific requirement that a medically diagnosed condition necessitate, in effect, an immediate abortion. However, as imported into HB 351, the requirements of Pennsylvania's health exception fail to account for the risks the state may create when a method of abortion is banned. This is unsurprising given that Pennsylvania's exception did not contemplate a ban.

Finally, it should be noted that the general abortion regulations at issue in *Casey* were ostensibly intended to provide a *benefit* to the pregnant woman by informing her and promoting her considered choice. *See Casey*, 505 U.S. at 885 ("[I]mportant decisions will be more informed and deliberate if they follow some period of reflection."). Here, the ban on the intact procedure provides no benefit to the woman. It serves only to deny the woman a medical option and violates *Carhart*'s instruction that a state may not "force women to use riskier methods of abortion." *Carhart*, 530 U.S. at 931.

In sum, *Casey*'s very different regulatory context makes the Pennsylvania health exception an inapposite and unconstitutional fit for HB 351.

### *CONCLUSION*

This case is about the health interests of pregnant women and the state's "substantial interest in potential life." *Casey*, 505 U.S. at 876. With its narrowly excepted ban, HB 351 unconstitutionally compromises the former by forcing women to use riskier methods of abortion. In particular, HB 351 imposes significant risks in the pre-viability context by failing to permit the intact procedure when it may avert health risks for a woman who does not have a medically diagnosed condition that complicates the pregnancy. Further, in both the pre- and post-viability contexts, HB 351 imposes significant physical risks upon a woman for whom a continuing

pregnancy or bearing a child would cause serious and irreversible harm to her mental health.

HB 351's pre- and post-viability bans on the intact method do not contain a constitutionally adequate exception to preserve the health of the woman. For the foregoing reasons, the judgment of the district court should be affirmed.